Okay, move on to the next matter, López-Razo v. Gonzales. Good morning, Your Honors. May it please the Court, Carl Spatara on behalf of Appellant Miriam Yepez-Razo, I'd like to reserve 10 minutes for rebuttal. We have 10 minutes. We only have 10 minutes. How much did you want to reserve? 10 minutes. Well, you've only got 10 minutes, so if you want to reserve 10 minutes, your time is up. Oh, okay. Two minutes. This case revolves around an individual who was a very young woman when the circumstances which formed the basis of this case occurred. She was 14 at the time that her father applied for family unity benefits on her behalf. Throughout most of the period of time until she became a lawful permanent resident, she remained a minor. There are two primary issues. The first issue was at the immigration court level. The immigration judge decided the case on a misconstrued reading of 212H. That's the administrative record at page 47. The government, in response to Appellant's brief before the Board of Immigration Appeals, raised a new issue on appeal. The government raised an issue and stated that the issue was not raised by Appellant on appeal. That was the issue of whether or not Appellant had, in fact, seven years of continuous lawful presence. Why don't you stand in the middle between those two? See, because we're recording everything. You know that, huh? Yes, I do, Your Honor. Okay. Okay. The Board of Immigration Appeals interdecided. I don't want to miss a word you're saying. Okay. Thank you, Your Honor. The first time here, so I'm very appreciative of the guidance here. The Board of Immigration Appeals decided on the issue raised by the government in their brief in the last paragraph. This is the administrative record at page 2. If you'd like to refer to where the government raised the issue, that's administrative record at page 3. But the issue at the lower court was 212H, a construction issue. Appellant argued that she was entitled to relief under 212H because she had accrued seven years of lawful continuous residence. The immigration judge decided the case solely on the fact that he said that the statute requires seven years of lawful permanent resident status before the commencement of immigration proceedings. This was a misreading of 212H. Well, let me just to save your time, we're bound to consider what the BIA ruled upon. Yes, Your Honor. And the BIA didn't say that. It said it didn't have to get there. Now, I may be misunderstanding your argument. Are you saying that the government raised the issue that the BIA relied upon too late? Or, I mean, if all you're trying to say is that the IJ was wrong, it really doesn't matter for our purposes, I don't think. I agree, Your Honor. In their one paragraph summary decision, the Board of Immigration Appeals decided it on the basis that my client had not accrued the seven years of lawful continuous residence. In essence, the Board of Immigration Appeals impliedly overruled the immigration judge because they decided on that narrow issue. However, appellant had never really fully addressed that issue, and to address that issue would require an evidentiary finding by the immigration judge. What do you mean by that issue? Are you talking about the January to June gap or the seven years? Okay. The January to June gap was an issue that was not decided by the immigration judge. Correct. That would have required an evidentiary ruling. Instead, the Board of Immigration Appeals took it upon themselves and made that decision based upon a representation by the government in their appeal before the BIA. Well, what evidence would speak to the question of the January to June gap? Okay. To the extent that appellant did address the issue, she raised it in the context of the meaning and the public policy behind the Family Unity Program. In 1991, her father originally filed her papers. Under the Family Unity Program, there was a public policy mandating a stay for Mrs. Yepes. The policy was to keep families together until the spouse or the child had a chance to adjust the lawful permanent resident status. This flew out of legislation of 1988, under which the dad acquired his status. Under the program of 1988, when father was issued a lawful temporary resident card, he was given a status. In 1990, because the Family Fairness Program wasn't strong enough, Congress enacted a mandatory stay and enacted the Family Unity Program, which included a mandatory stay. And under that, Mrs. Yepes was then allowed to apply for benefits under her father. In essence, she... How old was she at that time? Fourteen. And she was given a status just like her father during the period of temporary residence. Okay. This status was independent of the actual forms being submitted. Now, certainly, once the paperwork was submitted to the immigration authorities, they could act positively or negatively upon it. If they acted positively upon it, which they did in February 1992, they gave her the status that her father previously had, and he was a lawful temporary resident which, under the Family Unity Program, she was allowed to have. In 1995, she received notice under a settlement agreement that her application had to be reconsidered to show residence dating back to 1988. She did that. In 1996, she was given lawful permanent resident status. When proceedings commenced at the immigration court, the issue became whether or not she had seven years of lawful permanent resident status. Our argument is that she only needed seven years of continuous lawful residence. If we go back to the period of 1991, when the status of family unity was accorded to her, then that status remained until the period of 1999. She had the seven years of lawful permanent residence. The government will argue that there was a six-year gap in the voluntary departure paperwork, and there was. Actually, it was a three-month gap before she reapplied, which was backdated. But that paperwork was submitted by her father, remember, not by her, because he had to do all the paperwork since she was under his status. When the government, in June 1995, reaccorded her the status of administrative voluntary departure, their action related back to the 1991 petition of the father, therefore keeping her status intact. At the lower court level, the government, and even in the appeal before the Board of Immigration Appeals, tries to argue, attempts to argue that Mrs. Yepez was not in lawful continuous residence. But if she was not in lawful continuous residence, then she was in a status called unlawful presence. But that term, unlawful presence, is added to the Immigration Code in 1996 as part of IHRA-IHRA, that definition that they're working with now. But nonetheless, even IHRA-IHRA did not change the mandatory stay that was granted to Mrs. Yepez. So the immigration authorities certainly had the opportunity to revoke Mrs. Yepez's status at the time of the six-month gap prior to her lawful permanent residence in 1996. They did not. They granted her that. She ends up in trouble later in her life. She goes to immigration proceedings, and the trial attorney raises the issue that now the status should have been revoked. It's almost a retroactive application of the law. With that, Your Honor, I will. Your Honors, I shall. Kennedy. So your – the bottom line of your argument that her lawful status started on 11-2291. That is correct, Your Honor. And she acquired the seven years on what date again? It would have been 1998, seven exact years from that date. 1998. 1998. Okay. Which date was that? Okay. Well, she required lawful permanent residence in 1998. That's March of 1998, huh? No, no. She – I might have misspoken, Your Honor. Her lawful permanent residence status was obtained in 1996, but for purposes of 212-H, she obtained the seven years in 1998. The notice to appear which triggers the running of 212-H is 1999. So she – in our position, she met that standard with a year to spare. All right. Thank you. Good morning. May it please the Court. My name is John Hogan, and I represent the Attorney General. We really need to look at this case from 1999 back, not what happened in 1991. And the reason is because the petitioner committed a crime in this case, she needs a waiver to stay in the United States. And that waiver only applies if she's here seven years continuously, immediately preceding the filing of notice to appear, which we know is April of 1999. So now we're going to work our way back through that. We know in 1999 she's okay, 1998, 1997, and we get into 1996 and she's okay. But what we do show is in 1995, and I think we've almost heard an admission to this, there is a gap when her voluntary departure period initially expired. She waited until it expired, until she reapplied, and then about four months after she reapplied, it was finally granted. So really she's not in a lawful status until June the 13th of 1995. That is not seven years immediately preceding the notice to appear of 1999. Now the argument is, well, let's give her credit for what happened in 1991 when her visa petition was approved. Well, the visa petition is nothing more than a petition. It does not allow, when this Court has held, that does not give any kind of lawful status in here. What that allows her to do is when that petition becomes current, because she's put in a list, she's then eligible to adjust her status, and she does that. The visa petition becomes current and she applies on June the 16th of 1995. June the 20th, one year later, 1996, that application is approved. The problem is she still has a gap. And I don't mean to be facetious in saying this. The crime was committed too soon almost, because the crime had been committed later, the notice to appear would have been given later, and we really wouldn't be concerned about this gap in 1995 for six months. But the problem we have is that we do have a gap. And I just want to be clear about the Family Unity Program. The Family Unity Program is exactly for a petitioner like this. Her father is a legalized alien. And the Family Unity Program doesn't give any other, it gives benefits to work here, but it doesn't adjust, you don't adjust your status under the Family Unity Program. You have to be an eligible immigrant. She's eligible and was eligible because she was the daughter of a legalized alien. Then she has to apply for the Family Unity Benefit Program. And the benefit she really got from that is a grant of voluntary departure. It doesn't really seem to make sense, common sense as to why we're giving voluntary departure to someone. But the regulations are clear. 8 CFR 236.16c says, Voluntary departure implements the provisions of the Family Unity Program. So what we're going to do is, if we think you're eligible, which the government did, we're going to allow you to stay here for two years. And while that two years is going on, if your visa petition becomes current, you can apply to adjust. I mean, you can stay here as a lawful permanent resident. And that's exactly what she did. She was granted the privilege of staying here. Unfortunately, she committed a crime. But the government still recognizes a waiver of that crime. The problem is she needs to show she was here for seven years continuously for the notice to appear back. She doesn't have that. I have two kinds of concerns, and they're separate. Let me identify both of them, and then you can speak to them as you choose. One is that at the time of the gap, when her application for, I don't know if it would be called renewal or the new voluntary departure period or whatever else, she's still a minor and is limited, as I understand it, in what she herself can do. She's dependent upon the, not kindness of strangers, but dependent upon somebody else to act for her. The second concern, and I had, with all candor, difficulty sorting out the record here. I've noticed we receive a lot of immigration cases, so I may have confused this. But it's my impression as I go through this case that I couldn't figure out what had happened when she initially applied. Because as I go through here, it looks like there's an initial rejection for reasons that aren't clear. And yet at the same time, she gets that first two-year voluntary departure period. And it led to a concern on my part that, well, if there's a processing error on the government side in terms of dealing with her paperwork, that's something that shouldn't come back to haunt her either. I agree, Your Honor. I'll address the first point first. Was she a minor? Well, we do know she was born in December of 1976. She was granted her initial voluntary departure, not in the family union program because she was denied at that point, just normal voluntary departure to stay here because she was a child in 1993. And what happened was her family waited. They let that expire two years later. And basically three months after it expired, they reapplied. But she was over 18 by that point, by that point. So she was understandably at the initial voluntary departure period. So we do have a Petitioner who was at least of the majority of age 18 when the voluntary departure period was about to end for some reason. And we do know from the record on page 113 about three or four weeks after the initial period expired, she reapplied. There's no indication why she didn't apply to get the voluntary departure extended for some reason. As for the record, Your Honor, I think everything in there we need is we have the dates that we need in the record. I'll agree with you. Some of it is unclear because I had to figure it out. I haven't done family union program cases before. But in the briefs to the immigration judge on both sides laying out the case, there's a good, on page 104, actually, of the record, if you look at that, there's a pretty good list of the specific dates in the case. And I don't have any disagreement with that. I don't think it was even brought up that there was a problem with that. And that's where the government alleged for the first time that, you know, you need to look at the date gap here to the immigration judge. Now, the judge didn't rely on that, and the board did. So at least the judge was aware of that, but he chose to pick a different issue to hang his hat on. But what's clear is this. In the record is the date of February the 7th of 1995 that shows that's when she first applied for family unity program benefits. And that's in the upper left-hand corner of that page. So we know that's the day she applied. That doesn't get her anything until it's approved, but it was approved, and that approval allowed her to adjust her status. But as I said ---- This is 95, but she had done something to apply for and get the first two-year period of voluntary departure. That's correct, Your Honor. And what's the ---- I'll be honest. The opposing counsel's brief to the immigration judge and to the board really laid out the best. What happened is on page 110 of the record, we know she's initially denied family unity benefits program because there's a question about whether her father is a legalized alien by the specific date. That issue was reconsidered. Now, for some reason, she waited almost two years to have that reconsideration because that's when she's reapplied for family unity benefits. And her father reapplied for them. Exactly. Yeah. Okay. Exactly. And then she was granted the benefit of the voluntary departure. But that leads us to the next question of the waiver she needs for the crime seven years prior to the notice of ---- Well, why wouldn't that have retroactive application? The father applying, Your Honor? After she applied, then it was ---- Well, just because the ---- there's no evidence in the record that the government's unlike the case of which is cited in the briefs of Lepi, I'm going to say it wrong, Lepi-Guichon, which I know, Your Honor, was on that panel. There's no indication in this case, unlike in that case, that there was some kind of processing error by the government to slow something down for the child. What appears to happen is that the government had questions as to you didn't submit enough documents to show that you're one of these eligible immigrants for the program. So they let her reapply and they look at it again. But I guess the key is to keep her status here lawful for later on. She had the ---- she could have applied for that, not let that voluntary departure period lapse, I guess. And that's what's happened. That's now caught up to her and the fact that she's committed a crime. Let me pose a separate kind of concern. We're talking here about eligibility for waiver of removal and not talking about the ultimate decision because that doesn't belong to us. It belongs to the Attorney General. Should we be restrictive in defining as to whom the Attorney General can exercise discretion given that the ultimate decision is committed to him in a circumstance where the problems, excepting your characterization of them, are plainly of a paperwork variety? I mean, there's no doubt that she has been here, that the government's been conscious of her being here, that nobody was much bothered by the fact that she was here. It may not be like letting your driver's license lapse before you finally get around to getting it renewed, but it doesn't seem to be an offense of the kind that should or it could be argued it doesn't seem to be an offense of the kind that should keep the Attorney General from being able to decide whether or not waiver is appropriate in this case because ultimately the decision is his. I think that's right, Your Honor, and she probably would have been the benefit of that discretion if she could have met the statutory eligibility requirement of this. Should we be restrictive in interpreting the statutory elements if, in fact, by being expansive, all we're really doing is saying to the Attorney General, if you choose to exercise discretion here, this is a case where it might be appropriate for you to do so? Your Honor ---- And we know that she's been here all that time. We do, Your Honor, and I think that's specifically why Congress has allowed for a waiver for people like her. It's just, as I said, without trying to ---- she committed the crime almost too soon because that needs to notice to appear was given her sooner. She couldn't get to seven years, so they recognized discretion. We know she's been here. So are we putting a form over substance, as they say? I would say no, Your Honor, because the statute says it has to be continuous lawful presence. You can't go out to some kind of out-of-status method. She didn't leave. Did she ever leave? No, she didn't, Your Honor, but that's why voluntary departure allows her to stay here without leaving. That's the whole point of the family program. As far as continued presence in the United States, she's been here for 18 years. Yes, Your Honor. And just from the standpoint, because I always am interested in knowing what really is happening. She's now married to an American citizen, a soldier, and has two citizen children, right? Yes, Your Honor. And so we're busy trying to remove her. What happens then? Does she ---- is she removed? Is she entitled to voluntary departure or ----? Your Honor, I think it would be very tough for her, obviously. I'm not sure the status of any kind of application her husband has filed for her. I think there's indications of that in the record, but it's unclear and perhaps opposing counsel could speak to it better than I. I would just say her continuous presence also has to be lawful, and that's why the voluntary departure regulations are out there to keep her for that. It's just unfortunate that ---- Well, she wasn't unlawfully here during any of that time, was she? At that time, because she was not a criminal, she chose not to go after basically a child and let her stay here to keep her with her family. We were aware of her, but chose not to exercise any kind of prosecution or take her to an immigration hearing about that. This just seems like an awfully strange case to be devoting the time and energy of the Homeland Security to remove someone who's been here for 18 years, never left the country, that committed a crime, not a really serious crime, married to an American citizen soldier and two kids, American citizen children. You know, I'm baffled as to why this is the case that we are, you know, meticulously going through the statute to say, aha, there's a gap in there. Of course, you didn't leave the country, but there's technically a gap. Now, I guess like ---- And the file is so bewildering, it took me a while to figure it out. Myself, too, Your Honor. My father, he's an agricultural worker. He's working so we can eat. Right, Your Honor. And that's why Congress passed the Family Unity Benefit Program and provided waivers, even if you're going to commit a crime about that. But they were clear about it. You've got to be here for a little while in a lawful, continuous presence. And those words read together, she's one of the people that doesn't meet that. And, Your Honor, I anticipated about the questions about human being, too, about what do we do What are we going to do? Are we going to just kick her out of the country? Your Honor, I don't know if they will ---- What? I can't speak for what DHS will eventually do. They'll have a lawful order of removal if this Court upholds the Board's decision. Whether they enforce that order, and I say that, Your Honor, because when I was in Stanford with you in April, you recommended we go back to a case, and we got to convince the DHS to hold off on this guy that's been here for 50 years and fought in two wars with us, even though he brought 500 pounds of marijuana into the country. So I've seen it happen before. I don't know if that will happen in this case. But I guess the point is, she's not statutorily eligible for the waiver Congress allowed for people in her position, whether the order is enforced later on. I can't speak to that today. Thank you. Good job with tough facts. That was a long plane ride out here. That's right. Allow me to address one aspect of the issue. The original application of my client was filed 11-2691. For some reason, okay, it was originally denied. We don't know why. We filed it for you at the lowest level. We didn't receive the information. What we do know is that on October 31, 1995, as a result of a settlement, Alvarez v. INS, February 7, 1995, that the INS, the legacy INS, was then asked to reopen, and so it allowed people to have their family unity applications reconsidered. That's what she did, and eventually she was approved within eight months after that fact. So since the original legalization program was designed to get someone from lawful temporary resident to lawful permanent resident within two-year time, two years' time, then it would be reasonable to suggest that the same thing would have happened for the beneficiaries. From the time that she submitted the reconsideration sometime after October 31, 1995, it was less than eight months before she was approved for lawful permanent resident status. That's so, yes, there was some type of government delay. There was some type of government action which led to the long period of time during which she was without lawful permanent resident status. However, I believe when the government argues that voluntary departure is a status, that's correct. But I would assert that the family unity program also gave applicants and their beneficiaries a status. It gave her a special status under her father during which she could not be deported. So even if the government had intended to try to deport her during that six-month gap of voluntary departure, they would have had to commence some type of formal proceedings because it was a mandatory provision against deporting anyone under that program, as long as she could meet the prima facie requirements under family unity, which she did. Now, the other point is that, yes, there is a six-month gap between the application and the renewal of voluntary departure, but there's only a three-week gap between the denial of voluntary departure and when she reapplied. And we don't know when she received that notice. So we, you know, and I don't know, and we don't know because the paperwork is incomplete even at the lowest level as to why.  What paperwork are you lacking? Just the voluntary departure paperwork, which was independent of the family unity application. The family unity application was filed in 91. The voluntary departure provisions were added to the code, I believe, in 1992. The INS, under the regulations, added the voluntary departure requirements, and now you have to fill out the voluntary departure papers, okay? So that was an after-the-fact regulation which occurred, you know, about a half a year after she originally applied for family unity. And as I said, there was a settlement because immigration was denying a lot of these applications, and she had to come back in 1995. Now, I apologize for not having a complete record. I think opposing counsel would do the same. Both sides have attempted to get complete records. For some reason, we don't have a complete chronological table. But I would – but I assert that under the family unity program, under her – That's what you applied under FOIA. Yes. And I applied both at the local level and at the regular service center. And the paper – and we also applied under the father and under the daughter to try to get as much paperwork. And they just could not produce the paperwork we needed to have a complete chronological history. And you let you know they just didn't have it? They just didn't have it. And there's gaps. And even the six-month gap, that's in their paperwork. But no one has – but there's really nothing that says your voluntary departure is denied in January 1995. Renew it. There's no paperwork in the record to show that. We're assuming based on the representations that that's accurate. We know that in June 1995, she was renewed. So you can assume that there was something to that effect. But there's no copy that's ever been produced. In any event, you know, I still think the status of family unity under her father is relevant here. And I believe because she was a minor, even though, you know, and it's a different set of law, that that whole common law idea that the minor follows the parent is a relevant principle to adjudication of this case. Thank you. You've also done an excellent job with difficult facts, especially if you say this is your first time. I hope your client understands that the real source of her misery is the criminal offense and that if she does have an opportunity to stay, that she doesn't reoffend. I would hope so, too. I've seen clients that win appeals at the BIA level and then they do something wrong again. It's really a sad situation. But thank you for your time. What is the status of the criminal matter? It was a misdemeanor. She served everything. She's completed probation, paid her fine. And actually, if she were to prevail, I would ask her to expunge that conviction. It was a very minor conviction, minor theft offense. It was an offense. I don't mean minor in the sense of that any offense is minor. I mean minor in terms of the punishment that was given to her as a result of that. So the superior court labeled it as a misdemeanor? Yes. I believe so. We know it wasn't an aggravated felony for immigration purposes. I'd have to go back and look at the specific offense. A toddler, huh? Yeah. We were able to, in immigration courts, to show that it was just a crime of moral turpitude, you know, because she had not, you know, the amount of the crime and the nature of the crime. So it was just a crime of moral turpitude, which allowed her to qualify for 212-H. And it's interesting because had 212-C not been eliminated, she would have been easily eligible for that. But that was eliminated. So that's a non-fact in this case. Thank you very much. Are you going to check on that and see whether that was actually declared to be a misdemeanor? Yeah, if you allow me to look in my notes for a few minutes. Yeah. Okay. It could have been a felony. It was 180 days probation for three years. What did you say? 180 days was the punishment suspended. She didn't serve for 180 days. But a maximum punishment of 180 days for three years probation was attached. That was the actual sentence. Yes. And just to add to the earlier discussion. Was she completed all that? Yes. Well, she served her time and then she completed probation. I don't have proof today as I sit here that she's completed everything, but she did. She paid the restitution. She served, you know, some time in jail. And then she completed her probationary requirements. So that conviction is finished for her. Well, the time she served in jail, she was allowed to leave during the day, but had to come back at night? I am not sure about that. She spent just a limited. I think, again, I don't want to misstate, but a few weeks in jail before she was released as part of her crime. She made the restitution. Yes. And the other thing that I don't know, but her husband has been in Afghanistan the last 18 months. So that's where he's at now. He's in the army? Yes. And he's been there for about 18 months. She hasn't seen him in about a year and a half. What is his job? I didn't ask her that. I just assumed that if he's in Afghanistan, you know, he's in the direct line of fire. He was a pretty athletic fellow in high school, so I'm assuming he's pretty athletic in the military. Well, you've got to straighten that out, the record. If it can be, you've got to get, you've got to just check it and see if you can't get a declaration that it's a misdemeanor. I see you've got it expunged. Yes, and that's something I know that I would ask her to do, assuming that she prevails and has time. If this thing, you know, goes back to the lower court and she has time, then I would ask her to expunge the record. Why don't you do it now? I guess you could, yes. I hadn't thought about that. It's not hard to do, you know. No, no, it's not, Your Honor. I just thought that, well, the case would be seized. He's still out of form, I think. Yes. Yes, she could do it. Yes, it could be done very quickly. Talk to the probation officer. Yes. That's a good idea. Okay. That's my – I thought, well, these proceedings were on that. I had an advice. I thought they had to be finished before this. It's something that she's got to do anyway. Okay. Thank you. Thank you very much.
judges: Hug, Pregerson, Clifton